# **EXHIBIT A**

KURTA LAW
NATIONAL SECURITIES LAW FIRM

February 8, 2024

**Via FINRA Portal**

Elizabeth Muldoon
FINRA Dispute Resolution Services
55 W. Monroe
Suite 2600
Chicago, Illinois 60603

**Re: Richard Mertz, Janice Mertz, Lawrence Foreman, Sandra Foreman, Paul Aukee, et al. vs. Triad Advisors LLC**
**FINRA Case No. 23-03651**

Dear Ms. Muldoon,

This office represents the Claimants in the above-referenced matter.

Please accept this as Claimants' Amended Statement of Claim pursuant to FINRA Rule 12309. As required by Rule 12309, a copy of the proposed Amended Statement of Claim to add additional Claimants is annexed hereto as **Exhibit A**. In addition, you will find an updated uniform submission agreement annexed hereto as **Exhibit B**. Thank you.

Please do not hesitate to contact the undersigned should you have any questions or require further information.

Sincerely,

KURTA LAW

/s/ Robert Van De Veire

Robert Van De Veire, Esq.

KURTA LAW
NATIONAL SECURITIES LAW FIRM

February 8, 2024

**Via FINRA Portal**

Elizabeth Muldoon
FINRA Dispute Resolution Services
55 W. Monroe
Suite 2600
Chicago, Illinois 60603

**Re: Richard Mertz, Janice Mertz, Lawrence Foreman, Sandra Foreman, Paul Aukee, et al. vs. Triad Advisors LLC**
**FINRA Case No. 23-03651**

Dear Ms. Muldoon,

This office represents the Claimants in the above-referenced matter.

Please accept this as Claimants' Amended Statement of Claim pursuant to FINRA Rule 12309. As required by Rule 12309, a copy of the proposed Amended Statement of Claim to add additional Claimants is annexed hereto as **Exhibit A**. In addition, you will find an updated uniform submission agreement annexed hereto as **Exhibit B**. Thank you.

Please do not hesitate to contact the undersigned should you have any questions or require further information.

Sincerely,

KURTA LAW

/s/ Robert Van De Veire

Robert Van De Veire, Esq.

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

------------------------------------------------------------------- X

*In the matter of the arbitration between,*

RICHARD KIM, JEFFREY BOOS, CATHERINE BOOS, JAMES CONNELLY, ROSS DONAHUE, MELISSA DONAHUE, DONAHUE DITCHING, EDWARD KRNAK, RONALD CURCURU, HERBERT ABELSON and CONSTANCE ABELSON, individually and as trustees for the CONSTANCE F. ABELSON LIVING TRUST DTD OCTOBER 9, 1996, IAN BARONOFSKY, STEPHEN MAZZONI, RICHARD MERTZ, JANICE MERTZ, PAUL WILD, MARY WILD, MDM FAMILY LIMITED PARTNERSHIP, SEAN MULKEEN, CINDI FREIBERG, GAIL PISUT, STEVE POGORZELSKI, BRENDA POGORZELSKI, JOHN VAZQUEZ, VINCENT PENDOLA, KENNETH BOOS, CYNTHIA BOOS, EVELYN BOOS, STEVE KOPPEL, YOGLACKSHAN AHLUWALIA SAROJ AHLUWALIA, LAWRENCE FOREMAN and SANDRA FOREMAN, individually and on behalf of EIGHTY SIX LP, PAUL AUKEE, PATRICIA AUKEE, KATHLEEN GORNIACK, STEVEN GORNIACK, HARVEY COHEN, DAVID WILKS, KAREN TEITELBAUM, SCOTT ANDERSON, MARLENE ANDERSON, JANET ALDRED, JOSEPH GRABER, MARIETTA GRABER, JOSEPH AND MARIETTA GRABER IRREV. TRUST DTD AUGUST 2019, DIANA MASTRO, LAWRENCE BROUSSEAU, NINA BROUSSEAU, MICHAEL CHIN, SHIN SHIN CHIN, MICHAEL UGEL, KENNETH UGEL, CHRISTINE UGEL, CHARLES UGEL, LESLIE UGEL, CARL JOHANSSON, SHIRLEY JOHANSSON, KRISTIN NOWAK, MARK FRANTZ, SCOTT MASON, JANIS MASON, STEVEN POTASHNICK, JOANN POTASHNICK, RUSSELL KORENUK, DAVID SWEENEY, KAREN NICKERSON, FRANCIS CHVATAL, KEVIN SWEENEY, PATRICIA RINALDI, JOHN AIROLDI, EVERETT RANDLETT, SANDRA RANDLETT, MICHAEL RANDLETT, KATIE RANDLETT and ROBERT RODDY

FINRA No.: 23-03651

Claimants,

v.

TRIAD ADVISORS LLC,

Respondent.

------------------------------------------------------------------- X

---

**AMENDED STATEMENT OF CLAIM**

---

Claimants Richard Kim, Jeffrey Boos, Catherine Boos, James Connelly, Ross Donahue, Melissa Donahue, Donahue Ditching, Edward Krnak, Ronald Curcuru, Herbert Abelson and Constance Abelson, individually and as trustees for the Constance F. Abelson Living Trust dtd October 9, 1996, Ian Baronofsky, Stephen Mazzoni, Richard Mertz, Janice Mertz, Paul Wild, Mary Wild, MDM Family Limited Partnership, Sean Mulkeen, Cindi Freiberg, Gail Pisut, Steve Pogorzelski, Brenda Pogorzelski, John Vazquez, Vincent Pendola, Kenneth Boos, Cynthia Boos, Evelyn Boos, Steve Koppel, Yoglackshan Ahluwalia Saroj Ahluwalia, Lawrence Foreman and Sandra Foreman, individually and on behalf of Eighty-Six LP, Paul Aukee, Patricia Aukee, Kathleen Gorniack, Steven Gorniack, Harvey Cohen, David Wilks, Karen Teitelbaum, Scott Anderson, Marlene Anderson, Janet Aldred, Joseph Graber and Marietta Graber, individually and as trustees for the Joseph and Marietta Graber irrev. Trust dtd August 2019, Diana Mastro, Lawrence Brousseau, Nina Brousseau, Michael Chin, Shin Shin Chin, Michael Ugel, Kenneth Ugel, Christine Ugel, Charles Ugel, Leslie Ugel, Carl Johansson, Shirley Johansson, Kristin Nowak, Mark Frantz, Scott Mason, Janis Mason, Steven Potashnick, Joann Potashnick, Russell Korenuk, David Sweeney, Karen Nickerson, Francis Chvatal, Kevin Sweeney, Patricia Rinaldi, John Airoldi, Everett Randlett, Sandra Randlett, Michael Randlett, Katie Randlett and Robert Roddy (collectively, "Claimants")[1] bring this claim pursuant to the Financial Industry Regulatory Authority ("FINRA") Code of Arbitration Procedure by and through their attorneys, Gana Weinstein LLP and Kurta Law, against Triad Advisors LLC ("Triad" or "Respondent"). This arbitration proceeding is properly before FINRA pursuant to the agreements entered into by the parties and under FINRA Rule 12200, which require a member or an associated person of a member to arbitrate disputes arising out of the associated person or member's investment related business activities.

[1] Claimants bring these claims in their individual capacities, as well as on behalf of all trusts, custodial accounts, and retirement accounts over which they have an interest or control.

Claimants seek unspecified damages[2], including compensatory damages consisting of what a well-managed account would have performed in an amount presently unknown, together with interest, punitive damages, attorneys' fees, and all forum fees.

**REQUEST FOR EXPEDITED HEARING**

Claimants request an ***expedited*** hearing in Illinois based on residency. NASD Notice to Parties dated June 7, 2004, titled "Expedited Proceedings for Elderly or Seriously Ill Parties," provides that a claimant may request the arbitration process be expedited when the claimant is elderly or seriously ill. Claimant Joseph Graber is 82 years old.

Accordingly, and based on the foregoing, Claimants respectfully request that FINRA expedite this matter. FINRA's Arbitrator's manual states the following with respect to hearing dates for an expedited case, "Arbitrators should schedule dates that will expedite the process but still provide a reasonable amount of time for case preparation. FINRA encourages parties and arbitrators to schedule the hearing ***within six months*** from the date of the IPHC." FINRA Arbitrator's Guide, 2017 Revision, Pg. 23 (emphasis added).

**PARTIES**

**I. Respondent and Relevant Non-Parties**

***1. Triad Advisors LLC***

Respondent Triad Advisors, LLC is a FINRA registered broker dealer CRD # 25803 and an SEC registered # 801-55518, 8-42007. Triad Advisors, LLC's main office location is 5155 Peachtree Parkway Suite 3220 Norcross, Georgia, 30092. Consequently, Triad Advisors LLC is required to follow the rules and regulations promulgated by FINRA, the SEC, and Federal and State securities

[2] This is based upon an initial assessment of a portion of Claimants' investments presently available to them. Claimants reserve the right to amend the specific securities and the amounts of damages at issue as more information becomes available.

laws of the states that it conducts business in including Illinois as well as the firm's own internal compliance policies and procedures in carrying out its securities business.

Upon information and belief, Triad has been the subject of multiple arbitrations concerning the actions of its long-time registered representatives, James Walesa (CRD #1061209) and Kenneth Luccioni (CRD #719779), and the specific investments that are the subject of this arbitration. According to FINRA's publicly available BrokerCheck, these claims have resulted in settlements totaling ***more than $4.9 million***. Claimants also understand that Respondent is currently the subject of at least one regulatory investigation concerning the Claimants' investments that form the subject of this arbitration.

Triad is no stranger to such regulatory investigations. In fact, Triad was just recently fined and censured for its unsuitable recommendations and failure to properly supervise its representatives concerning investments offered by a company in which several Claimants also invested, known as LJM. Specifically, FINRA found that "Triad permitted the sale of LJM [Preservation and Growth Fund] on its platform without conducting reasonable due diligence of LJM and without a sufficient understanding of its risks and features, including the fact that the fund pursued a risky strategy that relied, in part, on purchasing uncovered options. Triad also lacked a reasonable supervisory system to review representatives' LJM recommendations. Triad representatives sold $2,267,000 in LJM to fifty-eight customers. LJM's value dropped 80% during an extreme volatility event in February 2018 and the fund ultimately liquidated and closed, resulting in hundreds of thousands in losses for Triad's customers."

***1. Non-Party James Walesa***

Non-Party James Walesa was at all times material hereto a registered broker with FINRA. Walesa has a lengthy history of customer complaints and personal financial issues and has recently personal bankruptcy and is believed to be under regulatory investigation for his actions that are at

issue in this Statement of Claim.

Walesa is also a gifted salesman who is believed to have raised nearly $100 million in investments for numerous companies with which he was affiliated and had an ownership interest. Through these illicit securities transactions, Walesa and Respondent violated numerous FINRA Rules, SEC regulations, and both federal and state law.

Walesa flaunted his involvement with these companies and was not shy about his fundraising activities. He consistently bragged to his clients about his leadership and ownership positions in the companies and encouraged his clients to encourage their friends and family to invest with Walesa – often stating, in writing, “do not keep my work a secret!”

The companies which Walesa touted to the Claimants as “sure things” and “great opportunities” have been anything but. Despite numerous consolidations and reorganizations, Walesa has apparently reorganized a number of these entities into a company whose shares are a penny stock.. According to his BrokerCheck, Walesa has been the subject of no fewer than seven (7) FINRA customer disputes, some of which involve dozens of investors, along with a judgment in excess of $2 million that is against him personally.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 11/10/2023 | Customer Dispute | Pending |
| 4/27/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 4/7/2022 | Customer Dispute | Pending |
| 7/8/2021 | Customer Dispute | Settled |
| 10/21/2020 | Judgment / Lien | |
| 6/13/2013 | Customer Dispute | Settled |

Additionally, per a recent filing with the US Bankruptcy Court for the Western District of Texas, Walesa is involved in numerous pending lawsuits in courts around the country. Unsurprisingly, Walesa is no longer in the securities industry.

***2. Non-Party Kenneth Luccioni***

Non-Party Kenneth Luccioni was at all times material hereto a registered broker with FINRA. Luccioni, like his partner Walesa, also has a troubled past in the securities industry. In fact, Luccioni was recently barred from the securities industry for refusing to cooperate with a FINRA investigation. Luccioni has also been the subject of no fewer than five (5) customer complaints, per BrokerCheck.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 1/25/2023 | Customer Dispute | Withdrawn |
| 6/27/2022 | Customer Dispute | Settled |
| 1/5/2021 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 11/9/2018 | Regulatory | Final |

## II. <u>Claimants</u>

***3. Richard Kim***

Claimant Richard Kim resides in Chicago, Illinois and lived there at times relevant to this dispute. He is 58 years old and was introduced to Mr. Luccioni through his job. Ultimately, Claimant Kim entrusted Luccioni with his retirement savings, a substantial portion of which he now fears has been lost.

***4. Jeffrey and Catherine Boos***

Claimants Jeffrey and Catherine Boos reside in Chicago, Illinois and lived there at times

relevant to this dispute. They are 68 and 67 years old respectively and retired. In addition to convincing the Boos' to invest a substantial amount of their retirement savings in his companies, Mr. Walesa also convinced the pair purchase a building from one of the buildings at a substantial premium. Ultimately, the Boos' suffered extensive losses in both endeavors.

***5. James Connelly***

Claimant James Connelly resides in Spearman, Texas and lived there at times relevant to this dispute. He is 49 years old and works as a farmer. At Walesa's instruction, he invested a significant portion of his life savings in Walesa's companies over a series of transactions. Claimant now fears that each of these investments will result in a complete loss.

***6. Ross Donahue, Melissa Donahue, and Donahue Ditching***

Claimants Ross and Melissa Donahue reside in Spearman, Texas and lived there at times relevant to this dispute. Ross and Melissa are 56 and 52 years old respectively. The two own a small business known as Donahue Ditching, and are looking forward to retiring in the near future. They considered Mr. Walesa to be a friend and turned over a substantial portion of both their retirement savings and overall net worth to their "friend" to invest. Unfortunately, Claimants fear that all of the money that he invested in Walesa's companies has now been lost.

***7. Edward Krnak***

Claimant Edward Krnak resides in Bartlett, Illinois and lived there at times relevant to this dispute. He is 69 years old and was a longtime client of Luccioni, who recommended that Claimant Krnak invest alongside him in Walesa's companies.

***8. Ronald Curcuru***

Claimant Ronald Curcuru resides in Brighton, Michigan and lived there at times relevant to this dispute. He is 81 years old and retired. Shortly after retiring in 2007, Claimant Curcuru was

convinced by Walesa to invest a large portion of his retirement savings in Walesa's companies. Now, Claimant Curcuru has lost irreplaceable funds that should have made him substantial returns had they been properly invested in legitimate investments.

***9. Kenneth and Cynthia Boos***

Claimants Kenneth and Cynthia Boos reside in Highlands Ranch, Colorado and lived there at times relevant to this dispute. Ken and Cynthia are 71 and 66 years old, respectively. The two are retired former customers of Walesa. As they were approaching retirement, Walesa approached them with a great investment opportunity – private investment in Walesa's companies. Believing Walesa had their best interest in mind, the Boos' invested a substantial portion of their retirement savings, much of which went into the companies. Now, instead of enjoying their retirement and the proceeds offered by suitable investments in a decade-long bull market, the Claimants are left wondering where their money has gone.

***10. Evelyn Boos***

Claimant Evelyn Boos resides in Park Ridge, Illinois and lived there at times relevant to this dispute. She is 97 years old and was a full-time mother for most of her adult life. Like her son Ken, Evelyn was recommended to Walesa and believed him to be a skilled financial planner. Shockingly, Walesa seized the opportunity to take advantage of Evelyn, convincing her to invest substantially in his companies in her 90s.

***11. Herbert and Constance Abelson***

Claimants Herbert and Constance Abelson reside in Granby, Massachusetts and lived there at times relevant to this dispute. Herbert and Constance are 83 and 79 years old respectively. The Abelsons are both retired. They were introduced to Walesa from a dear friend of theirs who was also a client of Walesa. Trusting this recommendation and believing that Walesa would do what

was best for them, they invested a significant amount of money in Walesa's companies.

***12. Ian Baronofsky***

Claimant Ian Baronofsky resides in Austin, Texas and lived there at times relevant to this dispute. Ian is a long-time client of Luccioni, whom he became acquainted with through his job as a physician. Luccioni was involved with Mount Sinai Hospital and regularly pitched his services to the physicians who worked there. Trusting him by virtue of his affiliation with the hospital and his assurances that he would do what was best for his clients, Ian invested a large percentage of his life savings with Luccioni, including a significant investment in Walesa's companies.

***13. Stephen Mazzoni***

Claimant Stephen Mazzoni resides in Arlington Heights, Illinois and lived there at times relevant to this dispute. Steven is 64 years old and approaching retirement. He was referred to Walesa through accounting clients who were also clients of Walesa. At Walesa's recommendation, Steven invested a significant amount of his savings with Walesa's companies.

***14. Richard and Janice Mertz***

Claimants Richard and Janice Mertz reside in Mt. Pleasant, South Carolina and lived there at times relevant to this dispute. Richard and Janice are 74 and 72 years old respectively. They are both retired. The Mertzes were recommended to Walesa by a friend and ultimately gave nearly all of their savings to Walesa to manage. Unfortunately, Walesa exploited their trust and diverted much of this money to his companies and other unsuitable investments. The Mertzes are now left with the fear that this money has been completely lost.

***15. Paul Wild, Mary Wild, and the MDM Family Limited Partnership***

Claimants Paul and Mary Wild reside in Palatine, Illinois and lived there at times relevant to this dispute. Paul and Mary are 67 and 66 years old, respectively. Paul retired in 2009. Mary

was forced to retire three years later due to disability, as she has been diagnosed with multiple sclerosis. They were recommended to Walesa by a family member, after receiving a windfall lottery winning of just over $1.5 million after taxes. Having never had this much money in their lives, the two wanted professional management, and Walesa came highly recommended. Unfortunately, he abused their trust for his own benefit by investing much of this money in his companies – all of which, Claimants believe has been lost.

***16. Sean Mulkeen***

Claimant Sean Mulkeen resides in LaRoy, New York and lived there at times relevant to this dispute. He is 46 years old and self-employed in the advertising industry. Sean was a client of Luccioni until the time Luccioni was barred by FINRA, and invested the bulk of his retirement savings with Luccioni. Unfortunately, Luccioni abused his trust by recommending investment in the Walesa companies, as well as LJM. Now, Sean is faced with the reality that most, if not all, of this money has been lost.

***17. Cindi Freiberg***

Claimant Cindi Freiberg resides in Inverness, Illinois and lived there at times relevant to this dispute. She is 69 years old and nearing retirement. She was introduced to Luccioni through a friend and trusted him completely. As a result of that trust, Cindi followed Luccioni's recommendation to invest in Walesa's companies.

***18. Gail Pisut***

Claimant Gail Pisut resides in Northbrook, Illinois and lived there at times relevant to this dispute. She is 79 years old and retired. Gail was referred to Walesa by her late brother. As a result, she trusted Walesa and followed his recommendation to invest in Walesa's companies.

***19. Steve and Brenda Pogorzelski***

Claimants Steve and Brenda Pogorzelski reside in New Berlin, Wisconsin, but lived in Holliston, MA and Mashpee, MA during the majority of time relevant to this dispute. Steve and Brenda are 62 and 65 years old, respectively. The Pogorzelskis were referred to Luccioni by one of Steve's co-workers. They trusted Luccioni so much that they eventually gave them a very large portion of their life savings, much of which went into Walesa's companies. Unfortunately, most if not all of this money has been lost.

***20. John Vazquez***

Claimant John Vazquez resides in Chicago, Illinois and lived there at times relevant to this dispute. John is 61 years old and works as an anesthesiologist at Mt. Sinai Hospital in Chicago. It was there that he men Ken Luccioni, who was involved with the board and finance committee at the hospital. Given his position, John trusted Luccioni, and invested a substantial portion of his savings with him. Unfortunately, Luccioni abused that trust, and Claimant fears this money has been lost.

***21. Vincent Pendola***

Claimant Vincent Pendola resides in Charlestown, Indiana and lived there at times relevant to this dispute. Vincent is 70 years old and semi-retired. He was introduced to Walesa by a co-worker at an auto dealership where he worked. Believing Walesa to be a skilled financial advisor, Vince entrusted him with the majority of his retirement savings. Sadly, Walesa abused that trust and invested a significant portion of Vince's savings in Walesa's companies.

***22. Steve Koppel***

Claimant Steve Koppel resides in LaGrange, Illinois and lived there at times relevant to this dispute. Steve is 57 years old and nearing retirement. He was a long-time client of Walesa, having

been referred to him by a family member in the early 1990s. For decades, Steve believed that Walesa was providing him with sound advice and suitable recommendations, when in reality just the opposite was true. Ultimately, Walesa recommended that Steve invest a large portion of his irreplaceable retirement savings in Walesa's companies.

***23. Yoglackshan and Saroj Ahluwalia***

Claimants Yoglackshan ("Yogi") and Saroj Ahluwalia reside in Oak Brook, Illinois and lived there at times relevant to this dispute. They are 78 and 77 years old respectively and both retired. Yogi was introduced to Luccioni by virtue of his affiliation with Mt. Sinai Hospital where Yogi worked. Trusting Luccioni by virtue of his affiliation with Mt. Sinai, he agreed to invest with Luccioni – a substantial amount of which was invested in Walesa's companies.

***24. Lawrence and Sandra Foreman***

Claimants Lawrence and Sandra Foreman resides in Deerfield, Illinois and lived there at times relevant to this dispute. Larry and Sandy are both 72 years old and retired. Larry was an auto mechanic, while Sandra worked primarily as a teacher for after-school programs. They were introduced to Luccioni by a friend of Sandy. Ultimately, at Luccioni's recommendation, the couple invested a large portion of their life savings in several failed investments, including Walesa's companies.

***25. Paul and Patricia Aukee***

Claimants Paul and Patricia Aukee reside in Grayslake, Illinois and lived there at times relevant to this dispute. Paul and Patricia are 69 and 70 years old, respectively. Both are retired. The Aukees were introduced to Walesa through family who were also clients of Walesa. Trusting Walesa, they gave him nearly all of their retirement savings to manage. Sadly, as he did to many others, Walesa abused this trust for his own benefit, investing much of their savings into his

companies.

***26. Kathleen and Steven Gorniack***

Claimants Kathleen and Steven Gorniack reside in Palatine, Illinois and lived there at times relevant to this dispute. The Gorniacks are both 68 years old and retired. They came to know Walesa through Kathleen's mother, who was his client. When her mother passed away, Kathleen entrusted Walesa with her inheritance. Rather than invest this money prudently, Walesa recommended they invest in his companies.

***27. Harvey Cohen***

Claimant Harvey Cohen resides in Los Altos, California and lived there at times relevant to this dispute. Harvey is 80 years old and retired. His wife Ilene is 78 years old and also retired. Harvey met Walesa through a former colleague. Over the years, Walesa invested Harvey heavily in his own companies, as well as high commission investments, including LJM. Like many others, Harvey believes that the money he invested with Walesa has been lost.

***28. David Wilks***

Claimant David Wilks resides in Elgin, Illinois and lived there at times relevant to this dispute. He is 75 years old and works as a wholesale merchandiser, a job he started recently after a long career as a studio photographer. David was introduced to Walesa through a photographer colleague, and he trusted Walesa immediately because of this. Unfortunately, that trust was immediately abused. David now believes that his entire investment has been lost.

***29. Karen Teitelbaum***

Claimant Karen Teitelbaum resides in Chicago, Illinois and lived there at times relevant to this dispute. She is 66 years old and retired. Karen met Luccioni through his affiliation at Mt. Sinai, where she also worked. Trusting Luccioni because of his position as finance chair at Mt.

Sinai and believing his representations about all the good work that he and Walesa were doing for investors, she invested with him. Karen now fears that this money has been entirely lost.

***30. Scott and Marlene Anderson***

Claimants Scott and Marlene Anderson reside in South Barrington, Illinois and lived there at times relevant to this dispute. The Andersons are both 50 years old, and long-time clients of Walesa. Marlene's brother, Claimant Michael Chin, was also an investor with Walesa, as well. Like the Chin's, Scott and Marlene fear that the money they entrusted to Walesa is gone.

***31. Janet Aldred***

Claimant Janet Alred resides in Elgin, Illinois and lived there at times relevant to this dispute. Janet is 61 years old and self-employed. She became acquainted with Walesa through a local networking organization. Given that others in the group had worked with Jim, Janet trusted him immediately. Unfortunately, Jim abused this trust – convincing Janet to invest a significant portion of her retirement savings and half of an inheritance she had received into his companies. Sadly, over the years, Janet has watched these irreplaceable funds vanish.

***32. Joseph and Marietta Graber and the Joseph and Marietta Graber Irrev. Trust dtd August 2019***

Claimants Joseph and Marietta Graber reside in Nokomis, Florida and lived there at times relevant to this dispute. The Grabers are 82 and 80 years old, respectively. Joe was a lieutenant for years with the Chicago Fire Department before being forced to retire due to a serious shoulder injury he sustained on the job. Marietta retired more recently from her job as a manager at a local hospital. The Grabers were long-time clients of Jim Walesa, who managed the majority of their life savings. It was at Walesa's recommendation that the Graber invested a substantial portion of their life savings and the proceeds of a home equity loan into Walesa's companies. They now fear that all of this money has been lost.

***33. Diana Mastro***

Claimant Diana Mastro resides in Huntley, Illinois and lived there at times relevant to this dispute. Sadly, Diana was widowed when her husband, Frank, passed away in late 2012 from cancer. Today, she is 64 years old and retired. She spent years working as a travel agent coordinating large groups such as weddings and corporate events. Unfortunately, she was forced into retirement due to the Covid pandemic. Th investments at issue had been recommended to Frank just prior to his passing. Certainly, Frank had intended this money would help support Diana, but instead, it went to fund a fraudulent enterprise – and is now gone.

***34. Lawrence and Nina Brousseau***

Claimants Lawrence and Nina Brousseau reside in Crest Hill, Illinois and lived there at times relevant to this dispute. Lawrence and Nina are 80 and 78 years old, respectively. Both are retired. The couple was introduced to Luccioni at a dinner investment seminar. The Brousseaus were impressed with Luccioni, and ultimately gave all of their retirement savings to him to manage. Unfortunately, Luccioni recommended that they invest a substantial amount of their retirement savings into Walesa's various companies. Critically, Luccioni misrepresented the nature of his and Walesa's involvement with these entities and the inherent conflict of interest.

***35. Michael and Shin Shin Chin***

Claimants Michael and Shin Shin Chin reside in Inverness, Illinois and lived there at times relevant to this dispute. The Chins are 61 and 64 years old, respectively. They were introduced to Walesa by family and trusted him implicitly as a result. As he did with so many others, Walesa abused their trust for his own benefit. Now, as they near retirement, the Chins believe that the money they entrusted Walesa with has been lost completely.

***36. Michael Ugel***

Claimant Michael Ugel resides in Park Ridge, Illinois and lived there at times relevant to this dispute. Michael is 40 years old and works in marketing. He met Mr. Walesa through his family, as his parents and siblings were investors with Walesa as well. Like his family members, Michael now fears that this money has been lost.

***37. Kenneth and Christine Ugel***

Claimants Kenneth and Christine Ugel reside in Schaumburg, Illinois and lived there at times relevant to this dispute. Kenneth and Christine are 62 and 61 years old, respectively. The Ugels became involved with Walesa through Ken's parents. Now, they fear that the money they invested in Walesa's companies has been completely lost.

***38. Charles and Leslie Ugel***

Claimants Charles and Leslie Ugel reside in Southport, North Carolina and lived there at times relevant to this dispute. Charles and Leslie are 60 and 57 years old, respectively. Like Ken and Christine, Charles and Leslie also became involved with Walesa through Charles' parents, and also believe that the investments held in Walesa's companies have been lost.

***39. Carl and Shirley Johansson***

Claimants Carl and Shirley Johansson reside in Downers Grove, Illinois and lived there at times relevant to this dispute. Carl and Shirley are 92 and 89 years old, respectively. Shirley is a retired office worker, while Carl is a retired plumber. Both have high school educations. They were referred to Luccioni by a friend of their son, when they were looking for somewhere safe to invest some of their retirement savings. Unfortunately, they found quite the opposite and fear that their money has been completely lost – despite receiving years of positive "propaganda" from Walesa and Luccioni over the years.

***40. Kristin Nowak***

Claimant Kristin Nowak resides in Palatine, Illinois and lived there at times relevant to this

dispute. Kristin Nowak is 40 years old and a substitute teacher. She was introduced to Walesa through her parents, Paul and Mary Wild. Ultimately, Kristin entrusted Walesa with her entire retirement savings.

***41. Mark Frantz***

Claimant Mark Frantz resides in Elmhurst, Illinois and lived there at times relevant to this dispute. He is 67 years old and retired. Mark and Luccioni were close friends, and Luccioni even attended Mark's wedding. Luccioni had Mark's complete trust. Regrettably, Luccioni abused that trust and convinced Mark to invest in Walesa's companies. This entire investment now appears to have been lost. Mark also suffered significant losses in other investments, including LJM that were recommended by Luccioni.

***42. Scott and Janis Mason***

Claimants Scott and Janis Mason reside in Townsend, Tennessee and lived there at times relevant to this dispute. The Masons are 66 and 69 years old, respectively. Scott works as a pilot, and Janice is a retired bookkeeper. The Masons were referred to Walesa by friends who were also investors. Believing Walesa to be skilled and trustworthy, the Masons entrusted him with the majority of their retirement savings. Sadly, they have recently come to realize that a substantial portion of their nest egg is now gone.

***43. Steven and JoAnn Potashnick***

Claimants Steven and JoAnn Potashnick reside in Chicago, Illinois and lived there at times relevant to this dispute. The Potashnicks are 74 and 66 years old, respectively. Both are retired. Steven was forced to retire due to a diagnosis of Parkinson's disease. The couple also has an adult daughter with special needs. The couple met Luccioni through an organization in which they were active. A gifted salesman, Luccioni convinced them to invest in Walesa's companies, as well as other speculative investments, including LJM. The Potashnicks believe that this money, which could have

been left for their daughter's continued care, has now been completely lost.

***44. Russell Korenuk***

Claimant Russell Korenuk resides in Gilman, Wisconsin and lived there at times relevant to this dispute. Russell is a 60-year-old self-employed refrigeration and heating technician. He became acquainted with Walesa through his aunt many years ago. Trusting Walesa due to this family connection, Russell invested his retirement savings with him. Now, he fears that this money has all been lost.

***45. David Sweeney***

Claimant David Sweeney resides in Punta Gorda, Florida and lived there at times relevant to this dispute. David is 67 years old and recently retired from a career in magazine advertising sales. He was introduced to Walesa through a former colleague in the advertising industry. After that introduction, David was impressed by Walesa and transferred a significant portion of his retirement savings to him. Walesa went about investing David's hard earned savings in risky, high commission products including at least one non-traded REIT, oil and gas investments, as well as LJM. Lastly, Walesa invested a large portion of it in his own companies, which is believed to have been completely lost.

***46. Karen Nickerson***

Claimant Karen Nickerson resides in Niles, Illinois and lived there at times relevant to this dispute. Karen is a 65 year old retiree, who inherited the investments at issue from her parents. Now Karen fears that this portion of her parents' legacy their children has been lost in its entirety.

***47. Francis Chvatal***

Claimant Francis Chvatal resides in Chicago, Illinois and lived there at times relevant to this dispute. Frank is an 80 year old retiree and former client of Luccioni. Despite Frank's request for reasonable conservative investments, Luccioni recommended that he invest a significant sum in

Walesa's companies, along with other speculative alternative investments, including Atlas and multiple non-traded REITs. Now this money is feared to be lost.

***48. Kevin Sweeney and Patricia Rinaldi***

Claimants Kevin Sweeney and Patricia Rinaldi reside in Hendersonville, NC and lived there at times relevant to this dispute. Kevin and Patricia are 70 and 68 years old, respectively. They met Luccioni through an investing presentation at the company where they both worked. In addition to the Walesa companies, Luccioni also recommended several other speculative investments, including Atlas, LJM, and others. Now, they fear that a substantial portion of their retirement savings has been lost at a time when they expected to have it available to them.

***49. John Airoldi***

Claimant John Airoldi resides in Shorewood, Illinois and lived there at times relevant to this dispute. John is 81 years old and retired from a decades long career as a union pipefitter on construction sites. Sadly, John was widowed several years ago. John invested a large portion of his retirement savings with Walesa, who recommended that he invest a significant portion in Walesa's companies and Atlas. Now, a large portion of his nest egg is gone.

***50. Everett and Sandra Randlett***

Claimants Everett and Sandra Randlett reside in White Lake, Michigan and lived there at times relevant to this dispute. The Randletts are both retired and 83 and 81 years old, respectively. They met Walesa through a mutual friend who recommended him highly. Given this glowing recommendation, the Randletts entrusted Walesa with the majority of their life savings. Unfortunately, Walesa selfishly invested this money in speculative products, such as LJM, and his own companies. This money has now been lost.

***51. Michael and Katie Randlett***

Claimants Michael and Katie Randlett reside in Commerce Township, Michigan and lived there

at times relevant to this dispute. Michael and Katie were introduced to Walesa by Michael's parents, Everett and Sandra. Like his parents, Michael entrusted Walesa with the majority of his retirement savings including rolling over his 401k, which Walesa invested in LJM, his companies, and other speculative securities. At Walesa's recommendation, the Randletts also invested additional money above and beyond the 401k, which Walesa again invested into his companies. The overwhelming majority of this money has been wiped out.

***52. Robert Roddy***

Claimant Robert Roddy resides in Port Richey, Florida and lived there at times relevant to this dispute. Robert is a 65 year old retiree, who spent decades operating trucks and other heavy equipment on construction sites. He eventually invested nearly his entire retirement savings with Mr. Luccioni, who recommended that he invest a significant sum in Walesa's companies. Now that money is feared lost in its entirety.

## INTRODUCTION

Claimants trusted Triad through its representatives Walesa and Luccioni (the "Brokers") to prudently invest their savings and act in their best interests. Instead, Triad abused Claimants' trust by recommending that the Claimants invest in several private entities in which Walesa (and in some cases Luccioni) were involved as either an owner, executive, or both. As set forth in greater detail below, FINRA imposes strict obligations on brokerage firms in the supervision of their registered representatives like Walesa and Luccioni.

Specifically, brokerage firms are required to carefully monitor and supervise their representatives' investment related activities. In circumstances such as this, where the representatives are soliciting their customers to invest in businesses in which they have either an ownership interest and/or an executive leadership position, brokerage firms are required to closely scrutinize these activities due in no small part to the inherent conflict of interest. These strict requirements are

designed to ensure investor protection. To that end, many brokerage firms simply prohibit their representatives from engaging in such fundraising activities and prohibit them from selling any investment product that is not been vetted by the firm and placed on the firm's approved product list.

Unfortunately, Respondent failed to adhere to these requirements and failed to protect investors, including the Claimants. Rather, Respondent allowed Walesa and Luccioni to openly raise nearly $100 million in investment from Respondent's customers without any interference or supervision. Walesa and Luccioni painted a rosy picture of the various corporate restructuring events which took place over the years between the various entities – each time assuring the Claimants that these were great deals and the investments were on the precipice of paying investors handsomely. Respondent also allowed Walesa and Luccioni to circulate fake account statements and investment updates to the Claimants which represented to the Claimants that the investments were performing well.

In doing so, Respondent violated its supervisory obligations and is responsible for the losses sustained by Claimants, which are substantial. Moreover, due to Respondent's tortious conduct, Claimants have been deprived of the ability to generate the reasonable returns they could have reasonably expected had they been invested in a *bona fide,* well-managed, and diversified portfolio of stocks, bonds, and/or mutual funds during the relevant time period.

## FACTUAL BACKGROUND

### I. Introduction

James Walesa considered himself to be (and portrayed himself publicly as) a skilled and sophisticated financier. To that end, Walesa became involved in a number of private and publicly traded companies over the past several years (hereinafter, the "Companies"). The list of companies in which Walesa was involved is extensive and includes, but is not limited to:

- Cibolo Creek Partners;

- Trident Healthcare;
- Longhorn Lodging;
- Shadow Retail;
- Farm to Market Development ;
- Hill Country Partners;
- Allied Integral United d/b/a Clearday;
- Round Rock Development Partners;
- Citadel Explorations;
- SitePro (f/k/a Amplisine Labs); and
- Gadsden Properties.

Walesa's involvement in these companies included roles as both an investor and/or an executive. For example, Allied Integral United Inc. (d/b/a Clearday) is a public company for which ***Walesa is the chairman and chief executive officer***.[3] Other examples include Citadel Exploration Inc., a public company of which ***Walesa was chairman of the board*** [4] and Cibolo Creek Partners, a private real estate fund of which ***Walesa is a Director***.[5] The Brokers' customers also invested heavily in Round Rock Development Partners, L.P. and Longhorn Lodging, LP—private funds for which ***Walesa's Cibolo Creek Partners is an executive officer and manager***.[6,7,8,9]

Walesa and Luccioni openly raised capital for the Companies. However, the two consistently cut corners, resulting in their capital raising activities being illegitimately structured and improperly conducted – ***making the sale of these securities highly illegal***.

Incredibly, despite the illegality of their endeavors, the two made ***<u>no attempts</u> to hide their***

[3] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[4] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[5] https://www.sec.gov/Archives/edgar/data/0001456537/000145653712000001/xslFormDX01/primary_doc.xml
[6] https://pitchbook.com/profiles/fund/15284-53F#overview
[7] https://pitchbook.com/profiles/fund/15285-52F
[8] https://www.sec.gov/Archives/edgar/data/0001337983/000133798314000003/xslFormDX01/primary_doc.xml
[9] https://www.sec.gov/Archives/edgar/data/0001456535/000145653514000001/xslFormDX01/primary_doc.xml

***activities from Respondent***. In fact, upon information and belief, Walesa even ***affirmatively disclosed*** to Respondent that he was both raising capital for and involved in the management of at least some (if not all) of the Companies. As to the public companies, his involvement was also publicly disclosed in the companies' respective SEC filings available on the EDGAR online repository. Walesa also filed multiple Form Ds[10] for many of the Companies with the SEC, which were publicly available on EDGAR, as well. A simple search of his name was all that was necessary to see every public company in which he was involved. Yet, it appears Respondent either never did that, or did but ignored the results.

Curiously, the Brokers' capital raising activities had all the hallmarks of being done with Respondent's acquiescence, blessing, and involvement. To wit, Claimants understand that Triad even had soliciting dealer agreements with several of the Companies pursuant to which Respondent agreed to raise capital from investors for those Companies – and receive selling commissions for its efforts. Respondent's customers also frequently received and executed official Triad paperwork in connection with their investment in the Companies that was on official Triad letterhead and that referred to the investments in the Companies as being "offered through Triad Advisors, Inc." The subscription agreements executed by investors in the Companies were also signed by the Brokers on behalf of Triad Advisors as the selling broker-dealer.

Then, after the investments were made, Respondent regularly processed dividend checks received from these Companies for the benefit of its customers and proceeded to deposit them in their respective customer's Triad account. In certain circumstances, such as where the investments in the

---

[10] A Form D is filed for all investments which are offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D offerings are exempt from the SEC's disclosure requirements and, other than the Form D, no other documentation or public disclosure is required under federal law.
3. Since there is very little public disclosure, Reg D private placements live in an information black hole, with investors kept largely in the dark about the funds operations and performance.

Companies were made through IRA accounts, Respondent entered into an arrangement with third party IRA custodians to custody these investments on Triad's behalf and process dividend checks.

The Brokers also emailed regularly with investors and the third-party IRA custodians about the status of their investments in the Companies. These third-party custodians were approved custodians by Triad and often housed legitimate investments.

Over the years, Walesa and Luccioni provided regular updates to investors on Triad letterhead and over email. These updates continued throughout their tenure with Respondent and were made both orally and in writing. The updates were designed for one purpose – which was not to the actually update the Claimants on the true performance of their investments – but rather to tell the Claimants that their investments were performing well and profitable. And it worked. Over the years, Claimants received updates about various acquisitions and mergers by and between the entities in which they had invested and were told about how these corporate actions would increase profits and returns to investors. Until very recently, Claimants believed that their investments were actually performing as the Brokers promised. Indeed, it was not until only a few short months ago, in September 2023 when Walesa filed for personal bankruptcy, that Claimants realized things may be amiss and began to fear that their investments had been lost.

As detailed in the next section below, the aforementioned actions taken by Walesa and Luccioni constitute numerous violations of FINRA, SEC, state, and federal regulations. Each of the foregoing should have been a red flag and call to action for Respondent. As a result of Respondent's failure to act, the Brokers' illegal activities continued for years unencumbered, resulting in substantial losses to the Claimants' irreplaceable savings.

## II. Respondent's Supervisory Obligations

The state of the law is unambiguous: a ***broker-dealer must supervise <u>all</u> investment related***

***activities of its registered representatives*** as though such activities were conducted through the broker-dealer. Yet, Respondent failed to supervise the Brokers' activities and, in doing so, violated applicable FINRA and SEC Rules.

The Securities and Exchange Act Section ("Exchange Act") 15(b)(4)(E) provides that the SEC can sanction or revoke the registration of any member firm:

> "if it finds…that such broker or dealer…has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, [the Securities Exchange Act of 1934], the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board, or has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision." (emphasis added).

***The Exchange Act requires broker-dealers to supervise a representative's investment activities, <u>no matter how the activity is executed</u>***, providing a prophylactic approach to supervision designed to prevent violations of the securities laws.

FINRA implemented Rule 3110 to comply with the Exchange Act's supervision requirements.[11] FINRA Rule 3110 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

---

[11] The duty to supervise is violated where either: (1) awareness of 'red flags' are not followed up with proper supervision; or (2) policies and procedures are deficient resulting in failure to detect 'red flags.' *See In the Matter of the Application of Michael H. Hume* ("Hume"), Exchange Act Rel. No. 35608, 52 S.E.C. 243, 1995 SEC LEXIS 983, at*5 (Apr. 17, 1995). (liability imposed "where a supervisor was aware only of 'red flags' or 'suggestions' of irregularities" and fails to follow up.); Kernweis, 2000 WL 33299605 at *13 (*quoting In re Scudder Investments, Inc.*, Investment Act Rel. No. 24218, 1999 SEC LEXIS 2737, at *18 (Dec. 22, 1999). ("[l]iability for failure to supervise may be imposed when a supervisor '[fails] to learn of improprieties when diligent application of supervisory procedures would have uncovered them.'").

Both FINRA and the SEC have focused on the high number of investment frauds perpetrated through outside business activities ("OBAs") and the fact that off-site locations may be used by brokers to conceal OBAs and securities fraud.[12]

At issue in this case are Respondent's obligations concerning: 1) the outside business activities and private securities transactions of its registered representatives (also known colloquially as "selling away"), and 2) the reasonable basis and customer-specific prongs of the Suitability Rule. As set forth in Sec. 1 and 2, below, as related to the Brokers' fundraising activities for the Companies, one of the two applies. To wit:

1. In the event that Walesa's affiliation with and solicitation of investment in the Companies was approved by Respondent as an outside business activity and private securities transaction, then the firm would be required to supervise Walesa's involvement, as well as supervise each of the investment transactions as if they were sold through the firm. *See, e.g.,* FINRA Rules 3270 and 3280.

2. On the other hand, if Respondent permitted Walesa and Luccioni to sell investments in the Companies through Respondent, then Respondent was required to conduct reasonable and adequate due diligence on the Companies before approving them for sale (reasonably basis suitability), as well as supervise each individual investment to ensure that it was suitable for the customer to whom it was sold (customer-specific suitability). *See, e.g.,* FINRA Rule 2111.

Claimants will demonstrate at the hearing that Respondent did neither successfully and is therefore responsible for Claimants losses suffered in their investments.

### ***1. Outside Business Activities and Private Securities Transactions of Registered Representatives***

[12] *Staff Legal Bulletin No. 17: Remote Office Supervision*, S.E.C. Release No. SLB-3A (CF), 2004 WL 5698359, at * 1 (Mar. 19, 2004) ("Some broker-dealer firms have geographically dispersed offices staffed by only a few people, and many are not subject to onsite supervision. Their distance from compliance and supervisory personnel can make it easier for registered representatives (representatives) and other employees in these offices to carry out and conceal violations of the securities laws."); *see* also NTM 98-38 ("[t]o be effective...[supervision] must be designed to monitor securities-related activities and detect and prevent regulatory compliance problems of such associated persons working at unregistered offices…").

Rules 3270 and 3280 are the primary rules that govern the supervision of outside business activities and private securities transactions of registered representatives. Pursuant to Rule 3270 "Outside Business Activities of Registered Persons", Respondent had a duty to supervise the Brokers' outside business activities. Specifically, Rule 3270 provides:

> No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member, in such form as specified by the member. Passive investments and activities subject to the requirements of Rule 3280 shall be exempted from this requirement.

Additionally, where, as here, a registered representatives' outside business activities are "securities related", FINRA Rule 3280 "Private Securities Transactions of an Associated Person" applies. For the purposes of Rule 3280, a "private securities transaction is defined as "any securities transaction outside the regular course or scope of an associated person's employment with a member", which includes the solicitation of the Claimants' investments in the Companies.

As for the Respondent's obligations, Rule 3280(a) provides that "[n]o person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this Rule." As stated in Rule 3110, final responsibility for ensuring its representatives' compliance with this Rule rests with Respondent. Subsection (b) goes on to require that the representative provide notice to the firm of his or her involvement with the private securities transaction.

Here, Claimants understand that Walesa disclosed his involvement in multiple of the Companies, including Cibolo Creek Partners, which ***still appears on Walesa's BrokerCheck Report to this day***. Accordingly, Respondent was obligated to undertake an investigation into these activities to determine whether or not it would approve the Brokers' participation. If Respondent

declined to approve the Brokers' participation, then Respondent had an obligation to ensure that both Brokers complied with Respondent's prohibition. On the other hand, if Respondent approved their participation, then Rule 3280(c)(2) (formerly, NASD Rule 3040(c)(2)) applies:

> If the member approves a person's participation in a transaction pursuant to paragraph (c)(1), ***the transaction shall be recorded on the books and records of the member and the member shall supervise the person's participation in the transaction as if the transaction were executed on behalf of the member***.[13]

(emphasis added).

This means that Respondent was ***required record these transactions on the firm's books and records and supervise the activity as if the activity occurred through the firm***. FINRA has warned firms that it is their responsibility to "review their supervisory procedures to make sure that they are reasonably designed to achieve compliance with [FINRA] Rules 3030 and 3040 [now 3280] regarding outside business activities and private securities transactions…" *See* NTM 01-79: Selling Away and Outside Business Activities.

FINRA has repeatedly sanctioned firms for failing to supervise a broker's outside business activities. In addition, the SEC has sanctioned brokerage firms for schemes conducted by their brokers through private securities transactions. In *In re Commonwealth Equity Services, LLP*, registered representative Bleidt misappropriated over $31 million from more than 100 victims through his RIA. SEC Rel. No. 56362, 2007 WL 3071391 (Sept. 6, 2007). The SEC stated that "[u]nder Section 15(b)(4)(E) of the Exchange Act, broker-dealers are responsible for reasonably supervising, with a view to preventing violations of the federal securities laws, persons subject to their supervision." *Id.* at *3. In *Commonwealth* the firm "failed to establish reasonable policies and

[13] FINRA Rule 3280(e)(1) defines "***Private securities transaction***" as "***<u>any securities transaction</u> outside the regular course or scope of an associated person's employment with a member, including, though not limited to, new offerings of securities which are not registered with the Commission***." Clearly the investments at issue were private securities transactions governed by Rule 3280.

procedures for responding to red flags related to Bleidt's outside business activities." *Id.* There are other similar examples of firms being sanctioned for failing to supervise outside business activities.[14]

Like Commonwealth Equity Services did nearly two decades ago, in this matter, Respondent Triad ignored the SEC's and FINRA's guidance on supervising private securities transactions and failed to properly supervise the outside business activities of its registered representative.

***2. Due Diligence Obligations for Firm-Approved Investments***

If Respondent approved the investments in the Companies and entered into selling agreements with them to sell these securities ***through the firm*** (as opposed to a private securities transaction), then the analysis would center around whether or not Respondent adequately supervised the suitability of these transactions.

FINRA Rule 2111,[15] also known as the "Suitability Rule," provides:

> (a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

FINRA breaks this analysis down into three components: 1) Reasonable basis suitability, 2) customer specific suitability, and 3) quantitative suitability.[16] *Id.*

When selling investments like those the Claimants made in the Companies, the first step broker-dealers must take is to conduct a "reasonable basis suitability" analysis. *See* FINRA Notice to

---

[14] *In re Signator Investors, Inc., et al*, SEC Rel. No. 75690 (Aug. 13, 2015) (finding that Signator failed to reasonably supervise both brokerage and advisory client activity of its representative leading to 125 clients being defrauded of $13.5 million).
[15] Formerly FINRA Rule 2310.
[16] Quantitative suitability is not pertinent to the Claimants' claims in this arbitration.

Member 03-71. This is the first step because before a broker-dealer can assess whether an investment is suitability for a particular customer (known as "customer specific suitability") it must first determine if the investment is suitable for sale generally. This process is often referred to simply as due diligence.

Rule 2111 states, in pertinent part:

> (a) The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.

The notion behind this obligation is simple – every investor, regardless of risk tolerance or sophistication, has a fundamental right to be protected from fraud and conflicts of interest. Although Respondent is obligated to conduct due diligence on every investment it offers to customers, FINRA and the SEC have long recognized a heightened importance of conducting due diligence where, as here, investment products are offered pursuant to an exemption from disclosure requirements. *See* FINRA Notice to Member 10-22.

In this case, most of the investments at issue were never registered with the Securities and Exchange Commission and, instead, were offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D exempts certain securities offerings from the typical disclosure requirements that are required of all new securities offerings under federal law. Generally, when companies want to issue securities, they are required to file a registration statement or prospectus with the Securities and Exchange Commission. This process, which involves publicly

disclosing all material risks in writing, is generally known as an initial public offering. Regulation D offerings are completely exempt from these requirements and, other than a short form called a "Form D," no other documentation or public disclosure is required under federal law.

Due to this inherent lack of disclosure and regulatory oversight, FINRA advises member firms, such as Respondent, that it must be particularly skeptical of such offerings. *See* Notice to Member 03-71. Among other requirements, Respondent would have been expected to review audited financial statements for the Companies and actively question any red flags contained therein. *Kunz v. SEC*, 64 Fed. Appx. 659 (10th Cir. 2011).

At the hearing on the merits, the Claimant will show that Respondent failed to conduct a proper review of the Companies and failed its reasonable basis suitability obligations.

Beyond that, Respondent was obligated to ensure that the investments at issue complied with Respondent's customer-specific suitability obligations. This means that Respondent was obligated to ensure that the Claimants' respective investments in the Companies were appropriate for them based upon their own unique investor profiles, including their respective risk tolerances, investment objectives, net worths, and the like. Claimants will demonstrate at the hearing that even if Respondent otherwise fulfilled its due diligence obligations (which it did not), Respondent's recommendations that the Claimants invest in the Companies were nonetheless unsuitable.

## III. Non-Walesa Company Investments At Issue

### A. Alternative Investments

Respondent and the Brokers also recommended that the Claimants invest in risky alternative investments. These include, but are not limited to limited partnership offerings by Atlas Growth Partners, Ridgewood Energy and other sponsors. Alternative investments commonly pay extraordinarily high commissions, but also expose investors to extraordinarily high risks, including illiquidity and loss of principle. For that reason, FINRA requires that brokerage firms conduct

extensive due diligence on them.

**B. LJM Preservation and Growth Fund**

Contrary to its name, the LJM Preservation and Growth Fund was very risky and sought neither preservation nor growth. Not only was LJM leveraged with high margin levels, but LJM also operated by selling naked put options on S&P 500 futures. The fund used these options to employ a highly complex strategy known as a "short strangle". A short strangle strategy has unlimited downside (no preservation) and limited upside (no growth). This strategy was extremely high risk. In fact, as early as July 2017, Morningstar reported that the Fund was an aggressive option seller that was "high risk" with high fees. *See* LJM Morningstar Report, dated July 13, 2017.

This is how the fund's strategy is described in its prospectus:

> The Fund seeks to achieve it investment objectives by capturing gains on options sold on S&P futures contracts that can be purchased ("closed") at a later date for a lower price than the price realized when originally sold… In the aggregate, the Fund is typically "net short" in the portfolio of contracts that it holds, which means that the Fund holds more uncovered option contracts then covered.

The fund's strategy was essentially to bet that market volatility would not increase significantly and that the market index level would not change. When both market volatility and market index declines occurred simultaneously, as they did during the first week of February 2018, the results were catastrophic for investors in LJM, who lost a combined $700 million dollars or 80% of the fund's NAV. On Monday, February 5, 2018, the share price of LJM plummeted 55.8% from $9.67 to $4.27. Then, on the following day, the price fell by more than half again – dropping 54.6% to $1.94. This represented a loss of more than 80%.

## LEGAL CLAIMS[17]

[17] The legal claims listed herein are not meant to be an exhaustive list of claims but merely illustrative of the types of claims being made in accordance with FINRA requirements to providea description. Claimants reserve the right to add or amend the legal claims and theories made herein and provide further detail in Claimants' pre-hearing brief.

## POINT I.

## BREACH OF FIDUCIARY DUTY

Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients.[18] In addition, FINRA has stated on numerous occasions that "the suitability rule and the concept that a broker's recommendation must be consistent with the customer's best interests are inextricably intertwined." NTM 12-25, Suitability, pg. 3 (Jul. 9, 2012). This means that "a broker make only those recommendations that are consistent with the customer's best interests prohibits a broker from placing his or her interests ahead of the customer's interests." *Id; see also Raghavan Sathianathan,* Exchange Act Rel. No. 54722, 2006 SEC LEXIS 2572, at *21 (Nov. 8, 2006); *Scott*

---

[18] *See Mansbach v. Prescott, Ball & Turben,* 598F.2d1017 (6th Cir. 1979) (a securities broker dealeris a fiduciary who owes its customer a high degree of care in transacting business); *Byrley v. Nationwide Life Insurance Co.,* 94 Ohio App. 3d 1 (Erie County 1994) ("broker and a client are ina fiduciary relationship."); *United States v. Wolfson,* 2008 WL 1969730, at *2 (S.D.N.Y. May 5, 2008) ("The essence of the argument is that there is no fiduciary relation between a broker and a customer unless the broker is handling a discretionary account. That is simply not true."); *E.F. Hutton & Co. Inc.,* Exchange Act Release No. 25,887, 41 SEC Docket 413, 418 (July 6, 1988) ("The concept of just and equitable principles of trade embodies basic fiduciary responsibilities…"); *Lipkien v. Krinski,* 182 N.Y.S. 454, 192 A.D. 257, 263 (N.Y. App. Div. 1920)(holding that transferring cash to broker gives rise to fiduciary duty regardless of defendants' claimthat they were only clearing broker); *Rolf y. Blyth. Eastman Dillon & Co.,* 570 F.2d 38 (2nd Cir. 1978) (registered representative; as broker for investor, owed investor a fiduciary duty); *Moholt v. Dean Witter Reynolds, Inc.,* 478 F. Supp. 451(D.D.C.1979) (stockbrokers are quasi-fiduciaries andare held to high degree of trustworthiness and fair dealing); *Pachter y. Merrill Lynch. Pierce, Fenner & Johnston. Inc.,* 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); *Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); *Leboce. S.A. v. Merrill Lynch. Pierce. Fenner & Johnston, Inc.,* 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); *Jaksich y. ThomsonMcKinnon Securities, Inc.,* 582 F. Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); *Utah State University of Agriculture and Applied Science y. Sutro & Co.,* 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trnstee dealing with public funds); *E.F. Hutton & Co. y. Weeks,* 166 Ga.App. 443, 304 S.E.2d 420 (Ga. 1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith); *Wilder v. Meyer,* 779 F. Supp. 164, 168-69 (S.D. Fla. 1991).

*Epstein,* Exchange Act Rel. No. 59328, 2009 SEC LEXIS 217, at *40 n.24 (Jan. 30, 2009) ("In interpreting the suitability rule, we have stated that a [broker's] 'recommendations must be consistent with his customer's best interests.'"); *Dane S. Faber,* 57 SEC 297, 310, 2004 SEC LEXIS 277, at *23-24 (2004) (stating that a "broker's recommendations must be consistent with his customer's best interests" and are "not suitable merely because the customer acquiesces in [them]"); *Wendell D. Belden,* 56 S.E.C. 496, 503, 2003SEC LEXIS 1154, at *11 (2003) ("As we have frequently pointed out, a broker's recommendationsmust be consistent with his customer's best interests.").

Respondent violated their fiduciary duty in multiple ways by: 1) recommending anunsuitable investment; 2) omitting material information and providing false and misleading information to Claimants; 3) breach of duty of loyalty through conflicts of interests and placing personal gain above the interests of the Claimants; and 4) failing to conduct due diligence on the investments recommended. These prongs will be discussed in the following sections.

**POINT II.**

**SUITABILITY**

Financial advisers must always make suitable recommendations to their clients and must abide by the suitability rules imposed by FINRA. The scope of these duties is defined in FINRARule 2111,[19] also known as the "Suitability Rule," which provides:

> (a) A member or an associated person must have a reasonable basis to believe that a ***recommended transaction or investment strategy involving a security or securities*** is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status,

[19] Formerly FINRA Rule 2310.

> investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

*See* FINRA Rule 2111 SUITABILITY (emphasis added); *see also* NYSE Rule 405; *In re Larry Ira Klein,* Exchange Act Release. No. 37835 (Oct. 17, 1996) (a representative may make "only such recommendations as would be consistent with [his customers] financial situations and needs."); *In re James Chase,* Exchange Act Rel. No. 47476 (Mar. 10, 2003), 79 SEC Docket 2892, 2897 ("The SEC concluded that the mere disclosure of risks did not satisfy the suitability duty...[n]ot only must the customer be sufficiently sophisticated to fully understand the risks involved with the investment, the customer also must be able to bear those risks.").

In addition, under FINRA 2090 "Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

Respondent and its agents violated their suitability obligations to Claimants by: (i) failing to conduct a reasonable basis analysis of the investment strategy recommended, (ii) failing to make customer-specific suitable recommendations, and (iii) over-concentrating Claimants' accounts in alternative investments and private placement investments. Each aspect of the suitability rule is discussed below.

**A. Reasonable Basis and/or Investment Strategy**

FINRA has long held that Rule 2310 "include[s] having a reasonable basis for recommendinga particular security or strategy." *See Notice to Members 96-32,* 1996 NASD LEXIS 51, 2 (May 1996); *see also F.J. Kaufman and Co.,* 50 S.E.C. 164, 168 (1989). First, a broker-dealer must determine whether the product or strategy is suitable for any customer, regardless of that customer's wealth, willingness to accept risk, age, education, or other individual characteristics. *See In re F.J.Kaufman*

*and Company of Virginia*, 50 S.E.C. 164 ("A broker-dealer must have an 'adequate and reasonable basis' for any recommendation that he makes.").

Respondent failed to conduct reasonable due diligence on the investments sold to the Claimants, the majority of which were alternative, non-traded investments. Such investments come with very high costs, fees, and commissions and have historically underperformed safe investments such as treasuries.

FINRA specifically reminded firms in NTM 03-71 that:

> Given the complex nature of NCIs [Alternative Investments] and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products.

FINRA reminded members offering NCI's, such as the Alternative Investments, alternatives of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risks and rewards associated with the particular product; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

In NTM 12-03: Heightened Supervision of Complex Products, FINRA noted it had previously issued multiple notice such as NTM 03-71, NTM 05-26, and NTM 10-22 with a "consistent theme in these Notices is that the complexity of a product often necessitates more scrutiny and supervision by a firm." *Id.*

FINRA has provided an in-depth notice on how to conduct due diligence. FINRA firms have an "obligation to conduct a reasonable investigation of the issuer and the securities they recommend in offerings…" Notice to Members ("NTM") 10-22: Regulation D Offerings, at 1; *seealso See Hanly*

*v. SEC,* 415 F.2d 589, 595-96 (2d. Cir. 1969); *SEC v. Great Lake Equities Co.,* 1990 U.S. Dist. LEXIS 19819 at *16-17 (E.D. Mich. 1990); *SEC v. North American Research andDevelopment Corp.,* 424 F.2d 63,84 (2d Cir. 1970); *SEC v. Current Financial Services, Inc.,* 100 F. Supp. 2d 1, 14-15 (D.D.C. 2000); *District Business Conduct Committee for District No. 4 v. Everest Securities, Inc.,* 1994 NASD Discip. Lexis 188 (Sept. 2, 1994), *aff'd,* 52 S.E.C.958, 962-63 (Aug. 26, 1996), *aff'd,* 116 F. 3d 1235 (8th Cir. 1997) (stating that firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims); Securities Act Release No. 4445, 27 Fed. Reg. 1415 (Feb. 2, 1962).

FINRA has stated that a brokerage firm has a "special relationship" with a customer "from the fact that in recommending the security, the BD represents to the customer 'that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation.'" *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). A brokerage firm "may not rely blindly upon the issuer for information concerning a company," in lieu of conducting its own reasonable investigation. *Id.*at 4 (*citing Everest Securities, Inc. v. US,* 116 F. 3d at 1239 ("reliance on others does not excuse [the respondent's] own lack of investigation").

Indeed, when an issuer seeks to finance a new speculative venture, brokerage firms "must be particularly careful in verifying the issuer's obviously self-serving statements." *Id.* (*citing Everest Securities, Inc.,* 116 F. 3d at 963). In addition, the SEC and courts recognize that a more thorough investigation is required for "securities issued by smaller companies of recent origin." *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). "The fact that a BD's customers may be sophisticated andknowledgeable does not obviate the duty to investigate." *Id.* at 4.

FINRA has defined the following parameters as the *bare minimum* a brokerage firm must document in conducting a reasonable investigation for a Regulation D offering and any subsequent offering for the same issuer:

- the issuer and its management[20];
- the business prospects[21] of the issuer;
- the assets[22] held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering
- whether the investor's money is likely to be applied according to the stated use of proceeds
- whether the stated use of proceeds is reasonable in light of the issuer's business purpose and prospects

*Id.* at 5; *see also In Re Brian Prendergast,* 2001 SEC LEXIS 1533 (Aug. 1, 2001); *Legend Merchant Group, Inc.,* NASD No. C10030058 (July 2004); *Shelman Securities, Inc.,* NASD No. C06030013 (Feb. 2004) (private placement memoranda contained material misrepresentations and omissions about use of proceeds in a previous offering). In order to demonstrate the brokerage firm has performed a reasonable investigation, the firm should retain records documenting both the process and results of its investigation. *Id.* at 7. The records should include descriptions of the meetings held of the investigation, tasks performed, documents and other information reviewed, results of the reviews, and the individuals who attended the meetings or conducted the reviews. *Id.* Accordingly, Respondent had a legal obligation to vet and independently investigate the investments and should have been able to provide a due diligence report prior to recommending Alternative

[20] FINRA provides a 13 point list of items a reasonable brokerage firm would review with issuerand its management. *Id.* at 8-9.
[21] FINRA provides a 5 point list of items a reasonable brokerage firm would review with todetermine the company's business prospects. *Id.* at 9-10.

[22] FINRA provides a 3 point list of items a reasonable brokerage firm would review with todetermine the quality of the company's business assets. *Id.* at 9-10.

Investments.

It is doubtful that Respondent ever conducted a meaningful investigation into these investments, the sponsoring entities, or Walesa's affiliation with them. In sum, Respondent failed to conduct a reasonable investigation into thequalities and performance of the investments recommended and could not form a reasonable basis for their recommendations and the investment strategy implemented in Claimants accounts.

**B. Customer Specific Suitability**

The second dimension of FINRA Rule 2310 requires the broker to have a reasonable basis to believe that the recommendation is suitable for the particular customer based on the customer's investment profile. The investment profile includes items such as: financial situation, tax status, investment objectives, risk tolerance, age, and investment experience. *See* FINRA Rule 2310, Recommendations to Customers (Suitability); *see also In re Larry Ira Klein*, Exchange Act Release. No. 37835 (Oct. 17, 1996) (Brokers may make only such recommendations as would beconsistent with the customer's financial situation and needs).

FINRA has also warned that "[a]s investors age, their investment time horizons, goals, risk tolerance and tax status may change…[and] seniors and retirees may have less tolerance for certain types of risk than other investors." NTM 07-43: Senior Investors, pg. 2 (Sept. 2007). FINRA also stated that it would scrutinize "recommendations to seniors…that involve…[p]roducts that have withdrawal penalties or otherwise lack liquidity, such as deferred variable annuities…real estate investments and limited partnerships" *Id.* at 4.

Many brokerage firms claim that if an investor's net worth is sufficient to invest in security that such a fact equates to suitability of high risk investments. In NTM 03-71 FINRA issued a clearwarning for firms that qualification does not equate to suitability:

> NASD cautions members against relying too heavily upon a

> customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. NCIs with particular risks may be suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.

NTM 03-71; *In re Arthur Joseph Lewis,* SEC Rel. No. 34-297941991 WL 294317 (Oct. 8, 1991) (The fact that a customer, such as Mrs. McGowan, may be wealthy does not provide a basis for recommending risky investments."); *In re Patrick G. Keel,* SEC Rel. No. 34-31716, 1993 WL 12348 (Jan. 11, 1993) (holding same).

Here, Respondent failed to understand Claimants' investment needs and objectives. Instead, Respondent thought only about their own commissions and unsuitably invested Claimants in the highest paying commission products available.

**C. Respondent Recommended an Impermissible Overconcentration in Alterative Investments**

A broker dealer is liable for a claim of unsuitability when it over-concentrates a client's account with a particular investment. *In re Holland,* Exchange Act Release No. 36,621, 60 S.E.C. Docket 2935(Dec. 21, 1995) (good faith immaterial to broker liability). Even if a broker claims a client has agreed to such an overconcentration, a broker's suitability obligations are not absolved. In *Holland*, the SEC concluded:

> Even if we were to accept [the broker's] view that these clients wanted to speculate and were aware of the risks-a conclusion not supported on this record-the Commission has held on many occasions that the test is not whether [the clients] considered the transactions in their account suitable, but whether [the broker] fulfilled the obligation he assumed when he undertook to counsel [them], of making only such recommendations as would be consistent with [their] financial situation and needs.

*Id*. at 736-37 (citing *In re Erdos*, 47 S.E.C. 985, 989 (Nov. 16, 1983)); *see also In re Wickswat*, 50 S.E.C. 785, 786-87 (Nov. 6, 1991).

Here, Respondent recommended investing an impermissibly large percentage of Claimants' portfolios into highly speculative alternative investments and other illiquid investments. Such concentration levels in Claimants' accounts should have raised "red flags" that the accounts were unsuitable.

**POINT III.**

**RESPONDENT EITHER FRAUDULENTLY OR NEGLIGENTLY MADE MATERIAL MISREPRESENTATIONS AND OMITTED MATERIAL INFORMATION IN THE SALE OF THE INVESTMENTS TO CLAIMANTS**

**A. Federal Securities Law**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. See 15 U.S.C.S. §78j. The SEC, pursuant to 15 U.S.C.S. §78j, promulgated S.E.C. Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5). In a typical § 78j (b) private action, a plaintiff must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between themisrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

**B. State Securities Acts, Common Law Fraud, and Common Law Negligence**

As herein described, Respondent and its agents violated provisions of multiple state securities acts,[23] including, *e.g.,* the Illinois Securities Act, 815 ILCS 5 et seq., and common law fraud. According to the Illinois Act, it shall be unlawful: "[t]o employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(I). Further, the sale of securities in violation of the Illinois Act provides for statutory interest from the date of sale in the amount of the rate of interest stipulated in the securities sold, as well as attorney's fees for the purchaser. 815 ILCS 5/13(A). As alleged above, Respondent's conduct violated the foregoing rules and laws.

### C. <u>Violation of FINRA Rule 2210</u>

The FINRA Rules require firms to provide only accurate and balanced communications, forecasting, marketing, and demonstrative information to clients. NTM 08-81 reminds members that:

> Sales materials and oral presentations must present a fair and balanced picture regarding both the risks and benefits of investing in these products. FINRA reminds firms that NASD Rule 2210 and IM-2210-1 require firms to ensure that statements are not misleading within the context in which they are made, and that firms must consider the nature of the audience to which the communication is directed…

In addition, FINRA Rule 2210(d)(1) provides:

> (A) All member communications with the public shall be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security, industry, or service. No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading.
>
> (D) Communications with the public may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast. A hypothetical illustration of mathematical principles is permitted,

[23] Claimants will provide legal briefing at hearing outlining the specific ways Respondent violated each of the applicable state securities acts. As the provisions of each are similar, the Illinois Securities Act is discussed by way of example.

> provided that it does not predict or project the performance of an investment or investment strategy.

Further, NTM 03-71 provides guidance concerning non-conventional investments stating:

> [M]embers should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the member, sponsor, or issuer.

*See* NTM 03-71. In addition NTM 10-22 provides that:

> If a private placement memorandum or other offering document presents information that is not fair and balanced or that is misleading, then the BD that assisted in its preparation may be deemed to have violated NASD Rule 2210. Moreover, sales literature concerning a private placement that a BD distributes will generally be deemed to constitute a communication by that BD with the public, whether or not the BD assisted in its preparation.

NTM 10-22 at 5.

### D. <u>Respondent's Fraudulent Misrepresentations and Omissions</u>

As alleged, Respondent provided false and misleading information to their clients in the sale of securities, management of accounts, and financial planning. As shown above, the presentations made to Claimants by the Brokers both in various marketing materials and orally were knowingly or recklessly false and misleading and omitted material information. Respondent misrepresented therisks and qualities of the investments being.

Respondent concealed known losses on Claimant's investments and otherwise attempted to cover losses. Respondent's representations concerning the performance and returns for these investments and the ongoing investment strategy were not balanced and presented Claimants fairly, an inexperienced investor in these products.

In addition, it is anticipated that with respect to certain investments Respondents will defend themselves by asserting the "prospectus" defense. This defense asserts that Respondent and its agents

are allowed to make false statements and misrepresentations to investors so long as a prospectus is provided. This defense has no merit and seeks to undermine the very purpose of the securities laws. According to the SEC, a person who makes oral misrepresentations to sell a security cannot wash away his liability by handing his victim a prospectus:

> At the expense of restating the obvious, we emphasize that compliance with these requirements for delivery of a prospectus or offering circular does not, however, license broker-dealers or their salesmen to indulge in false or fanciful oral representations to their customers. The anti-fraud provisions of the Securities Act and the Securities Exchange Act apply to all representations whether made orally or in writing, during or after the distribution. We have repeatedly held that the making of representations in the sale of securities unsupported by a reasonable basis is contrary to the obligation of fair dealing imposed on broker-dealers and their salesmen by the securities laws. **This obligation is not diminished because a prospectus or offering circular containing information specified by the Act and our rules has been or is to be delivered. Such information furnishes the background against which the salesman's representations may be tested. Those who sell securities by means of representations inconsistent with it do so at their peril.**

*In the Matter of Ross Secs., Inc.,* SEC Release No. 7069, 41 SEC Docket 509 (Apr. 30, 1963); (emphasis added); *see also In the Matter of the Application of Larry Ira Klein,* SEC Release No. 37835, 63 SEC Docket 52 (Oct. 17, 1996) ("Klein's delivery of a prospectus to Towster does not excuse his failure to inform fully the risks of the investment package he proposed").

This point has been made over and over again by FINRA:

> Members are also advised that, although the prospectus and sales material of a fund include disclosures on many matters, **oral representations by sales personnel that contradict the disclosures in the prospectus or sales literature may nullify the effect of the written disclosures and they make the member liable for rule violation and civil damages** to the customers that result from such oral representations.

NASD Notice to Members 03-71 (emphasis added); NTM 13-18: Guidance on Communications With the Public Concerning Unlisted Real Estate Investment Programs, pg. 2 (May 2013)("Descriptions of

real estate programs in communications need to be consistent with the representations in the program's current prospectus."); NTM 04-30 ("However, NASD reminds firms that simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials, whether prepared by the firm or the issuer."); NTM 05-59 ("Members are further reminded that providing risk disclosures in a prospectus supplement does not cure otherwise deficient disclosure in sales material, even if such sales material is accompanied or preceded by the prospectus supplement.").

**POINT IV.**

**RESPONDENT VIOLATED FINRA RULES 2010, IM-2310-2, AND 2020**

FINRA Rule 2010 requires members to "observe high standards of commercial honor andjust and equitable principles of trade" in conducting their business. FINRA Rule 2020 also prohibits members from effecting "any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." IM-2310-2 - "Fair Dealing with Customers" is cross-referenced by both of the aforementioned provisions and provides a non-exhaustive list of activities that would be inconsistent with the foregoing principals. *See* IM-2310-2: FAIR DEALING WITH CUSTOMERS. The first section of IM-2310-2 outlines member and associated persons obligations in dealing with customers as follows:(a)(1) Implicit in all member and registered representative

> relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

Respondent egregiously and intentionally violated many of the subsections of IM-2310-2, as discussed *infra.*

**POINT V.**

## FAILURE TO SUPERVISE

Respondent unreasonably failed to stop inappropriate sales. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees.

### A. Supervision Standard

Respondent failed to supervise their brokers' misconduct. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees. FINRA Rule 3010 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

FINRA Rule 3010: SUPERVISION.

The duty to supervise is a critical component of the securities regulatory scheme. *Inre Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Those who have aduty to supervise have an affirmative responsibility to uphold their duty. *Id.* Regulatory authorities such as the SEC, FINRA and the NYSE have steadily heightened the supervisory obligations of brokerage firms in recent years. Utilizing language employed by the SEC, "effective supervision by a broker/dealer is a critical element in the regulatory scheme and its importance hasincreased as firms have grown...broker dealers must provide effective staffing, efficient resourcesand a system of follow-up and review to determine that any responsibility to supervise…is being diligently exercised." *In Re Mabon Nugen & Co.*, 44 SEC Docket 1116, Release No. 27301 (September 27, 1989).

Evidence tending to establish a variance between conduct called for by a firm's proceduresand the actions actually undertaken by an employee of the firm may support a finding of liability.*Rupert v. Clayton Brokerage Co. of St. Louis, Inc.*, 737 P.2d 1106, 111 – 12 (Colo. 1987). Supervisors have

an obligation to respond vigorously and with the utmost vigilance to indicationsof irregularity. A supervisor cannot ignore or disregard red flags and must act decisively to detectand prevent improper activity. Indications of wrongdoing demand inquiry as well as adequate follow up and review. *In re Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Also, a violation of internal procedures may support a punitive damages award. *Alrich v. Thomson McKinnon Securities, Inc.,* 589 F.Supp. 683, 685 (S.D.N.Y. 1984). Finally, "a court [or other arbiter] may consider evidence of [a] brokerage firm's internal rules as evidence of the proper standard of care." *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir.1981); s*ee also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1986) (violation of NASD rule was evidence of broker's negligence).

**B. Outside Business Activities and Private Securities Transactions**

As set forth hereinabove, proper supervision requires compliance with Rules 3270 and 3280. Rule 3270 requires that brokerage firms properly supervise their registered representatives' outside business activities. In the event such activities are securities related and private securities transactions, Rule 3080 requires the brokerage firm to record these transactions on the firm's books and records and supervise the activity as if the activity occurred through the firm. Here, Respondent failed to do the same, thereby violating Rules 3270 and 3280.

**C. "Control Person" Liability**

Respondent is also liable to Claimants for misconduct under the theory of "control person" liability. Both federal and state securities acts impose "control person" liability on all persons who have the power, direct or indirect, exercised or not, to control another's sale of securities. *See*, *e.g.*, 15 U.S.C.A. § 78t (2011) (stating "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlledperson to any person to whom such

controlled person is liable…").

As used in all such securities acts, "the term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson &Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). Respondent was the "control persons" of their brokers at all times relevant to this dispute. Therefore, Respondent is liable for its brokers' misconduct.

**D. Respondeat Superior**

Respondent is liable to Claimants for all of its brokers misconduct under the theory of respondeat superior. Courts have held that respondeat superior liability is created by the "special duties that certain employers assume under the federal securities laws when their conduct is likelyto exert strong influence on important investment decisions." *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 181 (3d Cir. 1981). As also explained by the Fifth Circuit, "most investors rely upon the reputation and prestige of the brokerage firm rather than the individual employees with whomthey might deal. Such firms should be held accountable if employees they select utilize the firm'sprestige to practice fraud upon the investing public." *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1119 (5th Cir. 1980); *Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir.1981) (*cited by Sharp v. Coopers & Lybrand,* 649 F.2d at 182) ("(U)nder common law principles,a principal is liable for the deceit of its agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledgeof the principal.") *see also* Restatement (Second) of Agency § 261 ("A principal who puts a servantor other agent in a position which enables the agent, while apparently acting within his authority,to commit fraud upon third persons is subject to liability to such third persons for the fraud"). Similarly, the Sixth Circuit has emphasized that the broker-dealer has "an affirmative obligation toprevent use of the prestige of its firm to defraud the investing public." *Holloway v. Howerdd,* 536F.2d 690, 696 (6th Cir. 1976); *As You*

*Sow v. AIG Fin. Advisors, Inc.,* 584 F. Supp. 2d 1034, 1047(M.D. Tenn. 2008) (*citing See Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981), *cert denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Alvarado v. Morgan Stanley DeanWitter. Inc.,* 448 F.Supp.2d 333 (D.P.R. 2006); *Carroll v John Hancock Distributors, Inc.,* CIV.A.92-5907, 1994 WL 87160 at *4 (E.D. Pa. Mar. 14, 1994) ("[U]nder Pennsylvania law a principalis liable to third parties for the frauds, concealments etc. of his agent committed within the scope of his employment even though the principal did not authorize or know of such conduct, even if he forbade such acts.").

Respondent is responsible for all of its broker's investment related activities. Regardless of whether or not the firm prohibited misconduct.

**POINT VI.**

**FRAUDULENT INDUCEMENT TO HOLD INVESTMENT**

Claimants claim that Respondent's wrongful or fraudulent conduct induced Claimants to maintain a position and not to change such position, resulting ultimately in a loss. Respondent committed fraud on an ongoing basis, by inducing Claimants to hold onto the unsuitable investments. Respondent was the provider of investment advice to Claimants, including ongoing advice as to retention of the investments. Respondent owed duties to Claimants as previously described, including the

duty not to make misrepresentations of material facts and not to omit to disclose material facts from any communications or reports (oral or in writing) conveyed or delivered to Claimants, on an ongoing basis, not just on the front end.

Claims for falsely inducing investors not to act to their detriment are based upon the following principles:

> Restatement of Torts (Second), sec 525: "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the

> purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."
>
> Restatement of Torts (Second), sec 531: "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."
>
> Restatement of Torts (Second), sec 551("): "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose "

As a proximate cause of such false and continuing inducements to retain the unsuitable investments and unsuitable asset allocation in Claimants' portfolios, the Claimants were made to suffer a loss.

**POINT VII.**

**BREACH OF CONTRACT**

Claimants and Respondent entered into customer agreements in which Respondent agreed, among other things, to comply with all state and federal securities laws as well as FINRA's own regulations. Claimants complied with the terms of the contract between the parties, as memorialized by the parties, and performed or tendered performance thereunder. Claimants performed all conditions precedent and obligations incident to all of the above-referenced contractual obligations or agreements. Respondent breached the customer agreement with the Claimants by violating FINRA and SEC rules. Respondent also violated their own internal written procedures. Respondent is also a party to various "selling agreements" concerning many of these investments. In addition to Respondent's legal obligation to conduct due diligence, the selling agreements also contractually

obligated Respondent to conduct due diligence on the offerings. Claimants are third-party beneficiary to those selling agreements. Respondent failed to undertake reasonable due diligence into the offerings, breaching the selling agreement to the detriment of Claimants. As a direct and proximate consequence of Respondent's wrongful conduct, Claimants suffered damages.

**POINT VIII.**

**DAMAGES**

As a cause and consequence of the Respondent's misconduct in the handling of Claimants' investment funds, Claimants seek damages consisting of what a well-managed account would have performed in an amount presently unknown but.

In addition, Arbitrators have the power to award exemplary, or in other words, punitive damages. As the United States Supreme Court held in *Mastrobuono v. Shearson Lehman Hutton.Inc*., 514 U.S. 52 (1995), the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., grants arbitrators plenary authority to consider and make an award of punitive damages notwithstanding any provision of state law to the contrary.

Here, punitive damages should be assessed against Respondent and is wholly warranted due to the firm's intentional and willful failure to oversee its agent's activities. The callousness to the consequences which Respondent has shown cry out for a remedy that will not only make Claimants whole, but prevent a repetition of these events which have become all too common placein the industry. Every year millions of investors' funds are squandered or placed in risky high-commission generating strategies that are of no benefit to the investor. Moreover, brokerage firms continually ask for and advertise to induce the public's trust and confidence and then those same brokerage firms attempt to run away when the wrongful acts of those they employ are discovered. The perils that investors face when trusting the brokerage industry is fostered through a policy of scant compensation for victims

that profits the industry even when brokerage firms fail in their most basic duties.

FINRA firms continue to behave in a way that suggests that a lack of supervision, and the relatively small amounts of damages that result, are merely a cost of doing business to be borne rather than problem to be corrected. An award that falls short of assessing punitive damages will not take the necessary step of impressing upon Respondent the indisputable need to supervise and manage its employees in accordance with the rules of law and the business ethics of fair trade.

Accordingly, the panel should award punitive damages, interest at the legal rate per annum, as well as attorneys' fees, and costs.

## CONCLUSION

As a result of the conduct set forth above, Claimants requests a final hearing in this matter and that this Panel award damages from Respondent, as follows:

1. Compensatory damages at an amount to be determined at trial;
2. Statutory damages;
3. Interest at the statutory rate;
4. Attorneys' fees;
5. Expert fees;
6. Forum fees;
7. Punitive damages; and
8. Any and all other relief available to Claimants, in law or equity or otherwise, which may be granted to them by this Arbitration Panel.

Dated: February 8, 2024
New York, NY

Respectfully Submitted,
GANA WEINSTEIN LLP

By: ______________________________

Adam J. Gana
Adam J. Weinstein
345 Seventh Avenue
21st Floor
New York, New York 10001
Tel: (212) 776-4252

*Attorneys for Lawrence Foreman, Sandra Foreman, Paul Aukee, and Patricia Aukee, Richard Kim, Jeffrey Boos, Catherine Boos, James Connelly, Ross Donahue, Melissa Donahue, Donahue Ditching, Edward Krnak, Ronald Curcuru, Gail Pisut, Steve Pogorzelski, Brenda Pogorzelski, John Vazquez, Vincent Pendola, Kenneth Boos, Cynthia Boos, Evelyn Boos, Karen Teitelbaum, Scott Anderson, Marlene Anderson,Steve Koppel, Yoglackshan Ahluwalia Saroj Ahluwalia, Michael Ugel, Kenneth Ugel, Christine Ugel, Charles Ugel, Leslie Ugel, Carl Johansson, Shirley Johansson, Kristin Nowak, Mark Frantz, and Scott Mason*

*-and-*

KURTA LAW

By: _/s/ Jonathan Kurta________________

Jonathan Kurta
Robert Van De Veire
Hannah Ross
295 Madison Avenue, Suite 705
New York, New York 10017
Tel: (212) 658-1502

*Attorneys for Joseph Graber, Marietta Graber, the Joseph and Marietta Graber Irrev. Trust dtd August 2019, Richard Mertz, and Janice Mertz, Kathleen Gorniack, Steven Gorniack, Harvey*

*Cohen, David Wilks, Janet Aldred, Diana Mastro, Lawrence Brousseau, Nina Brousseau, Michael Chin, Shin Shin Chin, Janis Mason, Steven Potashnick, Joann Potashnick, Russell Korenuk, Herbert Abelson and Constance Abelson, individually and as trustees for the Constance F. Abelson Living Trust dtd October 9, 1996, Ian Baronofsky, Stephen Mazzoni, Paul Wild, Mary Wild, MDM Family Limited Partnership, Sean Mulkeen, Cindi Freiberg, David Sweeney, Karen Nickerson, Francis Chvatal, Kevin Sweeney, Patricia Rinaldi, John Airoldi, Everett Randlett, Sandra Randlett, Michael Randlett, Katie Randlett, and Robert Roddy*

FINRA

# FINRA Arbitration Submission Agreement - UPDATED

### In the Matter of the Arbitration Between

### Names of Claimants

**Richard Kim, Jeffrey Boos, Catherine Boos, James Connelly, Ross Donahue, Melissa Donahue, Donahue Ditching, Edward Krnak, Ronald Curcuru, Herbert Abelson and Constance Abelson, individually and as trustees for the Constance F. Abelson Living Trust dtd October 9, 1996, Ian Baronofsky, Stephen Mazzoni, Richard Mertz, Janice Mertz, Paul Wild, Mary Wild, MDM Family Limited Partnership, Sean Mulkeen, Cindi Freiberg, Gail Pisut, Steve Pogorzelski, Brenda Pogorzelski, John Vazquez, Vincent Pendola, Kenneth Boos, Cynthia Boos, Evelyn Boos, Steve Koppel, Yoglackshan Ahluwalia Saroj Ahluwalia, Lawrence Foreman and Sandra Foreman, individually and on behalf of Eighty-Six LP, Paul Aukee, Patricia Aukee, Kathleen Gorniack, Steven Gorniack, Harvey Cohen, David Wilks, Karen Teitelbaum, Scott Anderson, Marlene Anderson, Janet Aldred, Joseph Graber and Marietta Graber, individually and as trustees for the Joseph and Marietta Graber irrev. Trust dtd August 2019, Diana Mastro, Lawrence Brousseau, Nina Brousseau, Michael Chin, Shin Shin Chin, Michael Ugel, Kenneth Ugel, Christine Ugel, Charles Ugel, Leslie Ugel, Carl Johansson, Shirley Johansson, Kristin Nowak, Mark Frantz, Scott Mason, Janis Mason, Steven Potashnick, Joann Potashnick, Russell Korenuk, David Sweeney, Karen Nickerson, Francis Chvatal, Kevin Sweeney, Patricia Rinaldi, John Airoldi, Everett Randlett, Sandra Randlett, Michael Randlett, Katie Randlett, Robert Roddy**

**and**

**Names of Respondents**
TRIAD ADVISORS LLC

The undersigned parties ("parties") understand that an electronic signature below means that the party certifies that the information entered on the form is true and accurate, and that the party agrees to the terms of the following Submission Agreement.

The parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules. The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s).

The parties agree to abide by and perform any award(s) rendered. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

### *Electronic Signatures*

By entering your electronic signature below, you are one of the following: (1) the claimant; or (2) a person with legal authority to bind the claimant; or (3) a person with firsthand knowledge of the facts and actual or implied authority to act on behalf of the claimant; or (4) an attorney who has

actual or implied written or verbal power of attorney from the claimant to sign on the claimant's behalf and thus, bind the claimant to the terms of the Submission Agreement as if the claimant signed the form personally.

| Claimant | Signature | Capacity | Date |
|---|---|---|---|
| Mr. Richard Mertz | /s/ Jonathan Kurta | Attorney | 12/28/2023 |
| J&M GRABER IRREV. TRUST DTD 8 2019 | /s/ Jonathan Kurta | Attorney | 12/28/2023 |
| Mrs. Janice Mertz | /s/ Jonathan Kurta | Attorney | 12/28/2023 |
| Mr. Joseph Graber | /s/ Jonathan Kurta | Attorney | 12/28/2023 |
| Mrs. Marietta Graber | /s/ Jonathan Kurta | Attorney | 12/28/2023 |
| Mr. Lawrence Foreman | /s/ Adam Gana | Attorney | 12/28/2023 |
| Mrs. Sandra Foreman | /s/ Adam Gana | Attorney | 12/28/2023 |
| Mr. Paul Aukee | /s/ Adam Gana | Attorney | 12/28/2023 |
| Mrs. Patricia Aukee | /s/ Adam Gana | Attorney | 12/28/2023 |
| EIGHTY SIX LP | /s/ Adam Gana | Attorney | 12/28/2023 |

| | | | |
|---|---|---|---|
| Richard Kim | /s/ Adam Gana | Attorney | 2/8/2024 |
| Jeffrey Boos | /s/ Adam Gana | Attorney | 2/8/2024 |
| Catherine Boos | /s/ Adam Gana | Attorney | 2/8/2024 |
| James Connelly | /s/ Adam Gana | Attorney | 2/8/2024 |
| Ross Donahue | /s/ Adam Gana | Attorney | 2/8/2024 |
| Melissa Donahue | /s/ Adam Gana | Attorney | 2/8/2024 |
| Donahue Ditching | /s/ Adam Gana | Attorney | 2/8/2024 |
| Edward Krnak | /s/ Adam Gana | Attorney | 2/8/2024 |
| Ronald Curcuru | /s/ Adam Gana | Attorney | 2/8/2024 |
| Herbert Abelson. | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Constance Abelson | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Constance F. Abelson Living Trust | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Ian Baronofsky | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Stephen Mazzoni | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Paul Wild | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Mary Wild | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| MDM Family Limited Partnership | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Sean Mulkeen | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Cindi Freiberg | /s/ Jonathan Kurta | Attorney | 2/8/2024 |
| Gail Pisut | /s/ Adam Gana | Attorney | 2/8/2024 |
| Steve Pogorzelski | /s/ Adam Gana | Attorney | 2/8/2024 |
| Brenda Pogorzelski | /s/ Adam Gana | Attorney | 2/8/2024 |
| John Vazquez | /s/ Adam Gana | Attorney | 2/8/2024 |
| Vincent Pendola | /s/ Adam Gana | Attorney | 2/8/2024 |

| Claimant | Signature | Capacity | Date |
|---|---|---|---|
| Kenneth Boos | /S/ Adam Gana | Attorney | 2/8/2024 |
| Cynthia Boos | /S/ Adam Gana | Attorney | 2/8/2024 |
| Evelyn Boos | /S/ Adam Gana | Attorney | 2/8/2024 |
| Steve Koppel | /S/ Adam Gana | Attorney | 2/8/2024 |
| Yoglackshan Ahluwalia | /S/ Adam Gana | Attorney | 2/8/2024 |
| Saroj Ahluwalia | /S/ Adam Gana | Attorney | 2/8/2024 |
| Kathleen Gorniack | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Steven Gorniack | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Harvey Cohen | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| David Wilks | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Karen Teitelbaum | /S/ Adam Gana | Attorney | 2/8/2024 |
| Scott Anderson | /S/ Adam Gana | Attorney | 2/8/2024 |
| Marlene Anderson | /S/ Adam Gana | Attorney | 2/8/2024 |
| Janet Aldred | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Diana Mastro | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Lawrence Brousseau | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Nina Brousseau | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Michael Chin | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Shin Shin Chin | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Michael Ugel | /S/ Adam Gana | Attorney | 2/8/2024 |
| Kenneth Ugel | /S/ Adam Gana | Attorney | 2/8/2024 |
| Christine Ugel | /S/ Adam Gana | Attorney | 2/8/2024 |
| Charles Ugel | /S/ Adam Gana | Attorney | 2/8/2024 |
| Leslie Ugel | /S/ Adam Gana | Attorney | 2/8/2024 |
| Carl Johansson | /S/ Adam Gana | Attorney | 2/8/2024 |
| Shirley Johansson | /S/ Adam Gana | Attorney | 2/8/2024 |
| Kristin Nowak | /S/ Adam Gana | Attorney | 2/8/2024 |
| Mark Frantz | /S/ Adam Gana | Attorney | 2/8/2024 |
| Scott Mason | /S/ Adam Gana | Attorney | 2/8/2024 |
| Janis Mason | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Steven Potashnick | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Joann Potashnick | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Russell Korenuk | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| David Sweeney | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Karen Nickerson | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Francis Chvatal | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Kevin Sweeney | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Patricia Rinaldi | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| John Airoldi | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Everett Randlett | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Sandra Randlett | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Michael Randlett | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Katie Randlett | /S/ Jonathan Kurta | Attorney | 2/8/2024 |
| Robert Roddy | /S/ Jonathan Kurta | Attorney | 2/8/2024 |